All right, I believe we've submitted the first three cases on the calendar, so we'll hear argument in the case of Denise P. Edwards v. The First American Corporation and First American Title Insurance Company, No. 13-55542. And let me just ask, Mr. Spertus, have you decided how you're going to divide up your time? I'll be arguing five minutes for rebuttal and five minutes for the United States or the CFPB. Okay. All right. And then are you and Mr. Smith going to split ten minutes each? No. No. Okay. I'm Mr. Smith. I'm sorry. I'm sorry. Yeah. Very good. You may proceed. Good morning, Judge Gould, and may it please the Court, Cy Smith for the appellant. Congress outlawed kickbacks and referral fee agreements because they tend to increase prices and decrease quality for consumers in the real estate market. That's particularly the case for title insurance, as we made clear in our opening brief. When the plaintiffs finally got a chance to take some discovery about three and a half years after the case had been filed, we produced evidence of a national scheme by First American that lies at the heartland of RESPA's Section 8A prohibitions. First American's main argument today, as it was five years ago, is an insistence that it paid nothing of value for these referral fee agreements, that no consideration changed hands, or that it needs to be analyzed in each of the 38 transactions. But your theory, as I understand it, is that they paid... Not the theory in which we proceeded in moving for Class Cert in 2008, or the theory which we presented to the Court in 2010. So what's the thing of value? Because my understanding is that when title insurance policies are placed, there is a fee that's charged. The consumer, usually I guess the seller and the buyer, they split the cost of the premium. Correct. So is your argument that that premium is artificially inflated? I'm trying to figure out where's the money that constitutes the thing of value. It is not. And I think it would be helpful to hear the words of First American's President Parker Kennedy on this very subject. This was submitted to the trial court. We've handed up a copy and we'll file a supplemental excerpt of record today. And let me just make sure. Judge Gould, did you get this one page? Yes, I did. Okay. Go ahead, Mr. Smith. So the question was asked, is it true that in these transactions where you purchased a portion of the ownership interest of these title companies, and you received an exclusive underwriting agreement, that you purchased the right to receive that remittance income, that's the premiums, the money from the referral agreement, from the exclusive underwriting agreement? Answer, it was part of what we got for the consideration that we paid. So that's an admission by the company's president that when they paid a million dollars or five million dollars, one of the things that they got back was an exclusive referral agreement in every case. How is that different from, let's say, an oil company like Chevron acquires a franchise location, and as part of the agreement to sell the franchise to the franchisee, the franchisee agrees to buy its petroleum products from Chevron? Well, the answer is that Congress wanted to stamp out payments for referrals. Would you call that a kickback? I realize there's no statute that specifically addresses kickbacks in the context of the petroleum industry, but would your theory also apply? Would that be a kickback arrangement as well? In a franchisor-franchisee relationship, maybe and maybe not. I mean, each industry is different, but Congress did know that reverse competition dominated the situation in the consumer real estate market, and it focused on that market. It found harm in that market, and it found that there was distinct harm to consumers from these practices. That's why it outlawed them. But you answered my first question by saying that, no, our theory is not that extra money was paid for the acquisition of the partial ownership interest in the company. That's not where the kickback is, and yet it seems to me that's exactly what you're arguing. Respectfully, no. Am I misunderstanding your argument? The glue that binds this case together is both factual and legal. The legal argument is that when you pay an undivided amount of consideration, whether it's a million dollars or $100,000 or what have you, and you get back items one, two, and three, then it is consideration for all of those. It is consideration for all of those. That's the legal argument, and that's what this court found created a common, overwhelming question. The argument then, let's use a million dollars as a hypothetical acquisition cost, is the theory that the entire million dollars is the kickback? No. The theory is that it is at least a referral fee, whether you want to call it a kickback or otherwise. 8A speaks of both, and it says anytime you pay a thing of value in exchange for an agreement to refer business, that is prohibited by Section 8A. But, counsel, these businesses, because they were going concerns, obviously had some value. They could be subject to a commercial appraisal, and a commercial appraiser would come in and say that the value of 10% of the stock in this company is a million dollars. I hear your argument that part of the consideration was the stream of income that's going to come down the road from premiums, but would you not agree without regard to the referral agreement that you're complaining about? There would be value in the million dollars for the acquisition of the 10% interest that would have nothing to do with kickbacks. There may have been value, but the question under RESPA is not whether a million dollars was paid or one dollar was paid. It's whether there was an agreement. But the district court said you're going to have to show me on a case-by-case basis what that value is, how to quantify it. And I guess what I hear you arguing is no, we don't. All we have to do is convince you that somewhere buried in that million dollar acquisition cost for 10% is a kickback. Two points. The answer is yes. I think that's one way of putting it. Remember that the 2010 panel decision, which is the law of the case in this situation, the 2010 panel decision ordered nationwide class discovery over the same objection that you have just voiced, and that First American raised in 2010. I'm not voicing an objection. I'm asking a question. I understand. I'm trying to understand what your theory of the case is. Yes. And this whole debate was replayed in 2010 before the panel, and the panel said, we direct that there be nationwide class discovery, and then the plaintiff may renew her motion. It would have been futile to do that if we had to prove in each case the discrete amount of consideration that was chargeable. Why couldn't you hire an expert on valuation, a commercial business appraiser, who would look at each of the transactions and then opine First American overpaid by $250,000 when it paid a million dollars for a 10% interest in this company? It could be done, but it would require multiple, maybe not 38, but multiple analyses like that, and the district court said that's going to make it impractical for class search purposes. But what we have here That may be the case, but it would at least tell us what the thing of value is. The thing of value is the undivided amount of consideration, which as a factual matter, based on Mr. Kennedy's testimony, testimony from the director of mergers and acquisitions, based on First American's internal valuations, based on the smoking gun memos that were submitted to the board of directors of First American. So that's a factual case. The legal case, and I don't hear First American make a substantial argument against this, is that when you pay consideration, an undivided amount, it is deemed by law to be consideration for everything on the other side. That's the glue that binds us together. So the value is somewhere between zero and a million, but we don't know what the number is. It is somewhere between one dollar and a million dollars, and it is not up to us under Section 8A to have to prove a specific dollar value that was assigned to it. Why not? What if it's actually a de minimis amount that doesn't make a witted difference in the grand scheme of the commercial business? Well, first of all, I want to answer the question, but that is not the case here, that it was de minimis. How do I know that? The problem is with your theory, I'm never permitted to quantify or to ask you to quantify what the value is. Because for one thing, it would completely eviscerate Section 8A if you could throw anything, whether it was an acorn or a pencil or an airplane into the transaction, and then say, wait a minute, you haven't proved any consideration was paid for. But in our Ninth Circuit cases, I'm thinking of the yield spread premium cases, we have actually looked at percentage amounts, differences between the par rate and the market rate and so on, in order to ask whether that spread was a kickback. Yes. If we accept your theory here, I can't do that. I can't apply those Ninth Circuit cases. I completely disagree. Each of those cases is a situation where there was no explicit agreement to refer business, and therefore the court had to look at the fit between what was paid and what was received, what were the services, and see if there was a reasonable fit under Section 8C2. Here, there is a written referral agreement, so you don't need to discern it, and you don't need to go parsing through the individual transactions. If there had been an explicit referral agreement in those cases, in Schutz and all of the others, Glover, etc., those cases would have gone the other way because there would have been a payment for referrals, and that is our position. Let me understand that. Are you saying that those two cases were the application of either the defense or the exemptions for goods, services, or facilities, and this one is not? That's correct. Section 8C2, we submit, and the CFPB can speak to this, does not apply when there is an explicit agreement to refer business. In all of those other cases, you were trying to search for it and see whether you could certify a class on it, and that's very challenging. Those cases would have gone the other way if we had had this. You know, there's these murmurs all over in these cases that the statute is just inappropriate for class actions. What do you have to say to that? What I have to say on that is that those are cases like Howland, which is cited here, those are cases where there is not an explicit agreement to refer business, where there is something of value given and the question is, the things you got back, the goods or services, how do they match up? If there had been an explicit agreement to refer business, the cases would go the other way. It's the very task of trying to find it that makes those cases unsuitable for class cert. If you look at Howland, for example, the court said that classes are rarely certified in RESPA cases that present that type of issue, not that present this type of issue. There's no case out there that's on all fours with this. The Congress that enacted RESPA would have been astonished to hear the defense that because we threw something else into the deal that somehow there is no kickback or referral fee. Well, this expert, Strombaum, did exactly what Judge Tallman is suggesting and did a market evaluation. And at least on a number of examples he gives in the summary, is that on that grouping of acquired agencies versus new agencies, the examples they gave, I think all but one of them, there was a spread in the market value, in his estimate of the market value. If you took the low end, that they paid more than market value. Now, with that in mind, did you go back in your discovery and look for the underlying documents reflecting how First American itself evaluated? Yes. What did you find? We found in the smoking gun memos, and there's ten of them, we found in what they call the standard valuation analysis, which was a form, a spreadsheet form that had boxes that they used to try and value this, that First American assigned value to the stream of referrals that it would receive from the business. All that their expert proved is that after the fact, if you hire an expert, you can always try and find some range. I know you say he's the fellow from out of town, but other than these generalities, these textual statements that you have in your hit list of the smoking gun, is there a financial analysis back at the time of the acquisition that has hard numbers in it? Yes. The so-called standard valuation analysis. To each of the, I think there are 29 acquired agencies? Not as to all of them, but as to a significant number of them. I don't recall the exact number. And can you generalize as to what they generally indicate? I can generalize and say that in each case First American assigned as a portion of the value, as Parker Kennedy put it in his testimony, a portion of the value that they were going to get this stream of referrals. I can also tell you... Do they generally put a number on that rather than just saying a portion? Yes. Okay. Yes. Absolutely they do. Absolutely they do. And these documents are in the record? These documents are in the record, yes. All right. Let me speak if I might for just a moment about the question of these different types of business. First American presents a variety of defenses here based on these so-called new codes, the affiliated business arrangements, majority ownership, and so on. And we believe that these arguments are wholly without merit for the reason we've set forth. But if any of them had any substance, if they require further analysis on the merits, then that's a task that the district court could accomplish after certifying the class and then letting First American move for summary judgment. I thought the costs on creating some of these companies were as low as $200. There were one or two that were at the low end. That's correct. So let's pick up then with the discussion that you and I were having. Where's the thing of value in connection with the creation of a new company for $200, which I assume were the costs of incorporation? Well, the answer is that that's a legal argument by First American. They could make it at summary judgment, but it didn't destroy the ability to certify the class and then to make arguments that apply to large swaths of the class. I guess the problem I'm having with your argument is that it seems to ignore prong two of the HUD test, the second question being whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or the services that were actually performed. And if the payment was only $200, I'm back to my broken record theme here of show me the money. Where is the thing of value in the $200 cost of creating the new company? First of all, Your Honor, that's a handful out of the 38. Let's just deal with my hypothetical, which is one company and the cost to First American is $200. I understand that. And the answer to that is that Section 8C2, and this is the CFPB's position as well, does not apply in situations where there is a written agreement to refer a business. That is not a compensable item under any circumstances. That's why you don't have to do the fit analysis and say what's being paid. If that's the case, then what do I make of all of these memos to the Board of Directors saying that the value to First American in acquiring a minority interest in the company has to consider the future stream of revenue that will be generated down the road when we write individual policies and charge premiums for them? I'm starting to cut into my rebuttal time in the CFPB's, but let me try to answer. I understand. Your Honor, again, whether they paid $200, as they did in one or two cases, or whether they paid $1 million or $5 million, as was somewhat more common, or $500,000 in the middle, in every case there is a payment of value for a stream of referrals. And Section 8A doesn't... So where in my hypothetical do you answer prong two of the HUD test? Because the HUD test under HC2 does not apply when there is an express written agreement to pay for referrals. It doesn't apply. But I'm assuming in my hypothetical that the expectation was that there would be referrals down the road after this company gets up and running. Absolutely. But my point is that HC2 doesn't come into play, so you don't perform that analysis. It is not relevant when there is an express violation of Section 8A. So if there are some of the entities that may or may not be covered because there is no value in connection with the acquisition cost, then why doesn't that require an individualized examination of each of the transactions as the district court found? Well, first of all, it's not individualized in the sense of Rule 23b-3. It doesn't require the analysis of individual class members' transactions. The issue for class certification is whether a significant issue about the case can be decided on the basis of class-wide proof. And if First American is right that 5 or 10 or 14 of the agencies should drop out, they can make that argument at summary judgment. It doesn't defeat class certification, and it doesn't require individualized analysis. Would you concede then that with regard to my hypothetical NUCO, that once the business is up and running and title insurance premiums are being charged by First American, that there is no thing of value that's being exchanged beyond the premium for the title insurance? The thing of value analysis is at the outset. You don't have to pay a thing of value for each single referral. You can pay a lump sum and then receive the bounty of your kickback or referral fee. You don't have to prove it on an ongoing basis. But I think your position was with NUCO that it didn't apply at the start of the company. No, when money is contributed by First American to the entity, that is a thing of value. The best way I can answer... For dollars in my hypothetical? Yes. And let me say something else. First American says in its brief that the NUCO question is one that is completely separable. They say this on page 14 of their brief. Completely separable from everything else. If they have a legal argument why they should be excluded from the class, it's a simple matter that doesn't require a lot of proof, a purely legal argument to knock them out. But as a facial matter... Would the class be narrowed then to exclude all of the NUCOs? I think we're right about it. They think we're wrong and they could move for... Isn't the solution to simply narrow the class? That's an acceptable method. That's an acceptable method. I have no problem with that. You've got about six and a half minutes. I know. There are 16 of these new acquisitions. In round numbers, maybe 15. If you look at addendum pages 1 to 3 of our brief, it sorts them out. So I'm going to reserve the rest and thank you. Thank you. Good morning, Your Honors. Good morning, Judge Gould. May it please the Court, I'm Nandan Joshi for the Amicus Consumer Financial Protection Bureau. We're here because we believe the district court made two errors in its interpretation of RESPA in denying class certification in this case. We do not take a position on class certification, but we do urge the court to correct the two errors. The one, which was the focus of the argument earlier with Mr. Smith, was on the thing of value that was paid for in the referral agreement. The other issue, which did not come up, is what a private plaintiff must show to recover under RESPA and whether the actions of a third party can change whether or not a referral occurred. I'll save that towards the end. I think the thing I want to focus on with the thing of value is that the HUD test that Your Honor referred to applies to an accommodation that allows settlement service providers to purchase good services and facilities from each other. We don't think that applies because here we're talking about an investment, not a good service or facility under the plain language of the exception. But even if that test did apply, nothing in the regulation or the policy statements allow companies to take advantage of that safe harbor to extract commitments from other parties for the referral of future businesses. And that's the allegation that we potentially have here. Now the district court focused on whether or not the value given for the ownership interest in the title companies by First American was a fair price. But our view is whether or not it's a fair price. If the plaintiffs can prove that as a condition to that investment First American entered into a referral agreement with these agencies, then that itself is a thing of value. The deal itself is a thing of value under the broad definition. So it's a per se case whenever you have in an agreement for the acquisition of an agency that there be referrals. Yes, if there's an agreement for future referrals. And that would apply even if the referral provision was not exclusive, and that is if it said you must provide 50% of the business. Congress wants to stamp out referrals for anything other than essentially the merits of the referral. And so it provided a broad definition of a thing of value in RESPA itself. What do you say about the discovery that indicates that it was neglected in a lot of cases and had no meaning? Well, the liability under RESPA hinges on the payment and receipt of the thing of value. I don't know that the subsequent conduct necessarily mitigates that. But the argument I'm hearing you make is similar to what I thought I heard Mr. Smith make, and that is that it is a per se violation, that as long as there is an agreement in existence, it doesn't matter what the thing of value is. We don't have to worry about that. And that's not what the HUD test says. So I'm a little puzzled by the position that you're taking where the regulations say something different. Well, I don't think that's quite right. The thing of value in this case, it could be the overpayment. And perhaps in this particular situation, an expert could prove that First American overpaid by a significant amount for the interest in the title agencies. But it doesn't have to be if it's a condition to the deal. But I thought the discovery showed that it was, that First American was interested in acquiring various percentages of ownership in these entities, and one of the conditions was the referral of title insurance business to First American. Absent one of the exceptions in 8C of RESPA, a condition on a transaction would be essentially a per se violation. Without regard to the value of the money. That's right, even if the HUD test applied, if I purchased, if you had a garage sale and I purchased your inventory from you, and I say I will do that if you refer business to me. That's a condition for me purchasing inventory. What Congress said is that's an illegal transaction. You cannot do that. I can purchase your garage sale inventory. You can refer business to me. But if there's an agreement or an understanding, that's the language in Section 8A, connecting the two, then that's a violation of 8A, and that's a thing of value. There's no monetary threshold. Counsel, Judge Gould, if I could ask you a question. Absolutely. With that argument, how do you deal with our Ninth Circuit precedent? I think we've got a Schutz case and another case. Schutz and Lane. Suggest that if you pay something, but you're not paying more than the value of what you buy, that you haven't paid something of value for the referrals even though you get them at the same time. Well, neither of those cases involved a condition saying I will purchase yield spread premiums. I'll purchase yield spread premiums for you in exchange for you referring all future business to me. What the Schutz case deals with is the exception in 8C2, which says you can actually purchase goods and services that are actually provided, and what the HUD test says is, look, if you pay a reasonable price for that, we're not going to infer that you're paying for something beyond the goods and services you're actually receiving. I think the court in Schutz, and I'm reading from page 1013, actually says an illegal referral may be inferred by an unreasonable price. In this case, we're not talking about trying to infer an agreement for services for payment of a thing of value if the allegation is correct that there is a condition to the transaction. Okay, so because it's expressed, you think it's different. Let me question on your garage sale with Judge Talman. You agree to buy all the inventory in his garage, and he agrees to refer some work to you. If you don't pay more than the value of his garage inventory, is that a RESPA violation? If the evidence shows that the reason I purchased the inventory from you is to get that commitment that you refer business to me, then that is a RESPA violation under 8A, at least in the absence of one of the exceptions under 8C applying. In every RESPA 8A case, a plaintiff must show an agreement or understanding. It doesn't necessarily have to be expressed, but if it is expressed, then they can show that there's an exchange back and forth. And that really applies regardless of whether the exception for goods and services kicks in. You just can't condition a commitment for future referrals on a bona fide purchase of a good or service. And I think that's the distinction between shoots in lane and the current allegation. Right. Does goods and services under that exception, does that include stock of a company? I don't think so. I don't think under any plain understanding of those terms, goods, services, or facilities, it would include equity interest in an entity. If the court concludes otherwise, however, our position is still that you cannot use that power, that leeway that the statute gives you to engage in sort of normal business transactions in order to extract future commitments from. But how is that different from in shoots, for example, giving a financial incentive in order to increase the volume of work by paying the refer, the yield spread premium difference? Well, in shoots, there was no agreement for the broker to funnel future business back to the lender. That was not factual. That's the incentive, is it not? In other words, if the broker can sell the loan to the borrower at a percent above par, then they get the 1%. Do they not? Yeah. The way the court analyzed in shoots was the correct way, which is to say when you're paying this amount, are you in fact paying for the goods and services that the broker is providing with respect to this particular transaction? But the difference, the value there was the 1% that the referrer earned in referring the borrower to the lender. Right. There was no dispute that there was value given. The question in shoots was whether it was for the services that were actually provided. Right. But the thing of value was the 1%. Right. There was an actual cash payment in that case. Yeah. I mean, we could quantify. We knew what it was. Right. In lane, it was not a cash payment. It was a discount on it. You're now taking the position, I think, that it's not necessary to show and express cash value. Here's what I think is different. If shoots did not involve the payments for goods and services with respect to that transaction, but the lender had said, we'll pay you a yield spread premium, not only if you go above the interest rate, par interest rate, but you commit to referring all future business to me, then that would be a violation of investment. That would be a different case than what shoots actually decided. But I thought the statute makes the illegal and implicit as well as an explicit referral agreement. Why wouldn't that be an implicit agreement? Am I hypothetical? Well, my hypothetical would be probably explicit, but even if it was implicit. It would still be a violation. Well, it's an agreement on understanding. Whether it's tacit or express, I think, is not relevant. The problem, I think, that the plaintiffs have in this case, and I think the problem you're having with the position you're taking, is there is service provided for the premium that is charged. I don't think anybody's disputing that. That there are underwriting services, there are escrow closing services, there are risks, all of which are, I assume, factored into the amount of the premium that First American sets when it agrees to issue, let's say, a policy of title insurance on a half-a-million-dollar transaction. So the kickback's not there. And nobody has yet answered my question as to where the thing of value can be ascertained from the acquisition of the interest in the company. So I'm still trying to find out where prong two of the test is satisfying. We believe in the allegations, especially in paragraph 20 of the complaint. If First American is shown to have conditioned the investment in these companies on the receipt of a referral agreement, then the thing of value is the investment itself. And whether that's a fair investment, whether experts opine that that's within the range of reasonableness, or whether they're significantly overpaid, if it's a condition to the deal, we do not believe that that's something that's permitted under RESPA Section 8A. Okay. I think we have your position in mind. Thank you. Let's hear from First American. Thank you. Good morning, Your Honors. I'm Judge Gould, and may it please the Court. Your Honors, the last time this case— You're Mr. Murray? Yes, sir. Okay. Mr. Murray for First American. Let me ask you something, because it relates directly to what the government's lawyer was saying. Tell me why this might be an unfair approach. When you analyze the agreements and questions, you should look at them more like a macroeconomic issue, because it's an agreement that covers multiple individual transactions. Whereas in the Schutz and Lane cases, that's more of a macro— that you're looking at the individual transactions and trying to line up whether there was a quid pro quo. Is that a proper way to look at this? I'm not sure is the answer to that, but let me try it this way. In Lane, the Court was very clear that what the Court must do is look at the whole transaction, not just a small piece. But in connection with the transfer of an individual piece of property. Sure. All right. And in this case, we've got—and this is about class certification rather than liability, and I think that's important. At this stage, you've got Judge Otero, who went through and found at least three different grounds on which he could deny class certification, because you can't do class certification around those three grounds. When you look at the field of what he was looking at, what you find is a series of pieces that require one or more mini-trials, to the point where the judge would do nothing but focus on trials in this case, probably until you and I are long dead. I understand that. Okay. The first of those is Judge Otero said that there could be no class certification because there's no predominance of a referral for consideration. As I think Your Honor's pointed out, what is required for a RESPA violation is two things. One, a referral, and two, consideration. But it's also required they be together. The referral must be for the consideration. And as we laid out in our briefs, for example, there are— I guess that's what my original question is. If in individual transactions there are referrals, isn't—don't we look at this upon the bigger, the more global view, the macroeconomic view? And that is it's controlled by this overall agreement when they acquired the company or when they formed the agency. Isn't it dictated by that rather than the individual transactions? Well, the problem with that is, as I think my friend here pointed out, you do that, you run right into Dr. Strombaum's report, which is something we submitted, and they don't have a competing economist. So it's essentially unrebutted, right? And what Strombaum is saying is here are the possible values for this acquisition, and that acquisition value does not include the referral. That's not part of that price. And he also disagreed that there was a standard value calculation. He said no. Why would you want it in there, then, if it has no value? Why would you want it in the agreement? Why would you negotiate it? Honestly, the force of habit is the best I can think of. I mean, most of these, if you were to look at, for example, in ER 257 to 80, we've got plenty of examples of contracts that were negotiated 30, 40 years ago, and they're not exclusive or they've changed over time or ownership has changed over time. But the litany of testimony that's in, I don't like the expression, but it's called the smoking gun document. It may be smoking to them, but it may not be smoking to others. But anyway, that suggests globally that there was value for these referral provisions. Doesn't it? What the expert, Strombaum, is saying? I think we're on two different things here. I think Strombaum is absolutely right as to what he's saying. And I think these memos, two points on the memos. One is they say they're smoking guns, but really, as we laid out in our brief, the testimony suggested that these are memos to the board that get looked at after the price for these pieces of the industry are already decided, and that's on ER 235. But more importantly, these smoking gun memos really didn't have smoking guns in them at all. They were one piece. If you're supposed to look at the whole transaction, this is one minuscule piece of what is otherwise a ginormous transaction, 38 of them actually. You're not suggesting in response to Judge Murphy's question that your client saw no value in the future business that it was going to see as a result of the acquisition of a minority share, are you? No, sir, not at all. I guess the problem I'm having with Dr. Strombaum's conclusion is that why wouldn't that be, from an economic standpoint, a legitimate component that drove the price for acquiring the stock? That's what Dr. Strombaum said, and there's no contrary evidence. Certainly, like I said, the memos, these smoking gun memos, suggest that people within First American wanted this as a condition, as you say. But as Dr. Strombaum, I think, points out with a detailed economic analysis, that wasn't ultimately how the payments went. And as Your Honor points out, Except even Strombaum, in these examples he gives of, I think there's what, 28, 29 acquired agencies, and he picks out about six of them. With the exception of one, there's a gap, there's a range, rather, that he gives for the market value, correct? Yes. And if you took the low part of that range and compared it with the price paid, there's excess value, isn't there? If you took the low price, yes. Well, but he can't tell me that it's not the low price. No, that's right. So how does that help me? Where this comes back to, ultimately, I think, is where Your Honors were before, which is, and in any event, what is the price of these pieces of the companies we bought, and how do you show that that price was in excess of a fair market value? Is it $1, is it $3? We just don't know. So you're saying, if I cannot quantify it, I cannot consider it. Is that what you're saying? I think it's hard to do it in the abstract, right? Are you saying that merely because you can't quantify it, you can't consider it? No. For purposes of the merits, no, you're probably right. But for purposes of class certification, forgive me the time I've spent on this already, for class certification purposes, this is not something that Judge Otero can do in one swipe or two swipes. In fact, he's going to have to do the analysis you just did, plus hear it from experts, and there will be testimony, and nothing in this case is short. He'll have to hear all of those things in order to make a decision. Well, can't he make the generalization that what Strombaum has indicated to me is that in the, as they say, mill run of the case, is that there's a range. And therefore, invariably, except in the one example he pulls out, there's going to be an amount that could be tributed to that, even assuming his valuation methods are correct. Why can't you generalize from that and say, well, there must be a combination of that? But it's not a common issue, right? I mean, even right there in the hypothetical you've posed, you've got to look at all of these 28 agreements, right, and the evidence and the testimony that comes along with them. Even if you gave each agreement a day, I mean, that's talking half a year already. And that's one of the reasons the class certification was appropriately denied. Another one is... Well, let me ask you, isn't Tower City the exemplar of the plaintiffs? Tower City is what plaintiffs point to. The difference between this case and Tower City is this court said Tower City was appropriate and could be done because it was one agency, one agreement, and what drove it does that one agreement violate RESPA. Here we've got 38 agencies with agreements that go back 30 or 40 years in the negotiations, and we've got agreements that are not exclusive, that are somewhat exclusive, or that First American has withdrawn from entirely and is not even a part of. But what I'm trying to get over is the statement of the previous panel in this case that focusing on Tower City indicates that if there is an obligation to refer customers, then there is a common question here. And so doesn't that mean that in all cases where the agency agreement has an obligation to refer customers, that by law of the case, there's a common question there? No, Your Honor. I think that statement works well for Tower City because in Tower City's situation, you have one agreement and just people talking about one agreement. It's a fairly short case. If you apply that paradigm, I don't disagree with the language at all. I'm not trying to get out of it, but what I'm going to say is in this particular case, how that lines up with that is in that case, again, there was one agreement and one affidavit from First American saying sometimes someone didn't do anything. Here, we have dramatic agreements across the board from people like banks and lenders, mortgage brokers, realtors, builders, and closing attorneys, all of whom say that First American, it wasn't a referral of title insurance by First American, that in fact they were the cause. Oh, that's your other issue. That's kind of the causation or the multiple cause thing or in another setting we call a mixed motive case. But that's different than this. We're talking about the action element. Isn't that what it was called? The action element of referral. That has to do with more into the causation. So doesn't that expression there, isn't that the law of the case in that any agency that is like Tower that has an obligation to refer, there's a common question. So doesn't that require reversal on that one issue? But when you say obligation to refer, again, and forgive me if I'm retreading ground here, but is there an obligation to refer, as I think Judge Tolman pointed out, in a world where these contracts are often honored in a breach, that they don't demonstrate that they always directed putative class members to First American or that they were exchanged for an understanding agreement that business be incident and referred to First American. In the real world these contracts may say what the contracts say, but in the real world they were often not honored. And like I said, you can find numerous examples of these in ER 257 to 80 where what happened was First American slowly bought down its share and then eventually got rid of it. How can it be held liable for that? Well, if it was violated in the sense that they referred 50% of the business rather than exclusively, wouldn't that still be a problem? Again, if it's violated, all of these points come between a referral on the one hand and the payment of money on the other. All of my three points that follow the brief are exactly that. There's no logical connection, no necessary connection between the payment of a good and the referral. Because remember, the only payment, as we heard my friend say, the only payment we're talking about is the payment at the beginning when you buy your share. Right. What I call the global or the macroeconomic analysis, which doesn't that taint each of the underlying transactions? I don't think so. I think it's some uncareful words spoken by people. But in fairness, that is what they wanted. They did want some of these referrals. It's just they don't violate RESPA. Counsel, Judge Gould, I have a couple of questions for you. Yes, sir. When you're done responding to Judge Murphy? I think I'm done, Your Honor. Okay. So my first question is this. Would it be fair to say that there are common issues here, but the critical question is whether they predominate over the individual issues? Yes, Your Honor. I believe that. Now, what are the issues that you would say are common issues? Common issues could be as did First American have title insurance agreements? Did some of them have agreements in them? Would it be a common issue whether First American obtained exclusive rights to get referrals in exchange for what they paid for the share of the agency? No. And it also is not a predominating issue, but it's not even common because, again, common questions, as Your Honor points out, have to drive the resolution of the case. And here, looking at the papers to figure out whether there was an agreement on the paper or not doesn't get you an answer that drives the resolution of the case. The answer that drives the resolution of the case is not just the paper. It's also the testimony and the affidavits and the documents that show what was actually done, not just this paper that says we'll give you referrals and you have to refer all your stuff to us. Actually, it has to look at not just that paper, but what people saw, what people did, was it honored in the breach, and you'll find that in most of these cases those provisions didn't stick. Does that answer your question? Yes. I think that what I was trying to do was get a summary of your view as to what are the individual issues that you contend predominate over the common ones. The individual issues would be did First American violate RESPA? And you can't do that without looking into the specifics of each transaction, and that's been our position here the whole time. I want to ask you a question about the record that I should probably know the answer to, but I don't for certain, and that is for each of these purchases, was there an appraisal of the company bought for appraisal of the company apart from the value of the referrals? That would be at $257 to $280. What's $257 to $280? Whether there were referrals. No, no, appraisals. Appraisals. Oh, there were appraisals then. Yeah, $257 to $280. I thought there were conflicting facts as to, I guess, the adequacy of those appraisals that sometimes all they looked at were sort of pro forma financial statements and then they offered them a sum of money. That's right. I mean, Dr. Strombaum did the best that he could, but there were not documents available for all of these. Isn't it best to consider the market value if you have to at the time the transaction took place rather than reaching backward as an expert does and have that suggest that even though I can't put a dollar value on it, there must have been some value for this referral. Isn't that an appropriate approach? Well, Your Honor, that might be another approach, but it wasn't one that certainly plants have no expert at all. So that our expert did it his way is not impugning it at all because he didn't do it another way. He came up with valuations and he looked at them and he said, by God, these things don't involve... Well, but it was done another way originally. What you're just telling us is that there were these things called appraisals and they were just kind of at best guesstimates and that was the way they did it. So that's another approach, isn't it? The way that was actually done is another approach in Stromberg. And the fact that you've now pointed out three different ways on which it could be done is another reason why Judge Otero would be right to say that class certification is inappropriate because... That it is necessary to do this market evaluation theory rather as opposed to the government's approach that it doesn't matter. That's true. And again, this is just one reason. I've talked a little bit about the action and the causation requirements. I've talked not quite as much about the separate agency and transaction issues, but I think you guys covered that unless you have questions for me on those. Well, I just want to follow up on Judge Gould's question because it does seem to me that the common issue that Judge Otero was focused on would be whether First American paid something more than fair market value in order to obtain these exclusive rights to referrals when it acquired the interest in each agency. Isn't that the question? I think that's right. All right. Unless the court has further questions, I'd cede the balance of my time. Judge Gould, anything further? No, thank you. Thank you, Your Honor. All right, thank you. I guess Mr. Swerdis, I know you've used... Yeah, Smith, I'm sorry. Go ahead. I'll give you a couple of minutes in rebuttal. I apologize for continuing to confuse you with your co-counsel. If it were a different co-counsel, I'd be more offended. Okay. First, let me answer you, Judge Murphy. You asked for an example of how these standard valuation analyses assigned a number. Take a look at ER-48, which is a transaction where they assigned a value of $1.7 million to the remittance stream. Those are the future referrals, the premiums that they get as a result of the deal, and that's not isolated. There are other examples throughout the record. The second thing I'd like to say is... If it is necessary to look at each one of these agreements to see if there's... You can say there's value there given beyond the market value of the company and therefore must be attributed to the referral provision, does that destroy commonality right then because you have to look at each individual agency? I would say no. First of all, we don't think you need to get there because of the common proof from Parker Kennedy and because as a matter of law, you pay the million dollars, you get these things. But if the standard is as you've described, the proof is already here. It's already in a chart. And so if there is a standard valuation analysis or, I'm sorry for the phrase, a smoking gun memo that shows value was assigned, then you don't need a mini-trial on that. How many of the 38 agencies can you say that there is this amount, that there's something expressly attributed in the acquisition documents to that? I know that there were 10 of the board memos. I won't call them smoking gun memos. And I think that there were a like number and probably a few more of these standard valuation analyses. So probably more than half. Of the 38, probably 20? Probably in that range, yes, sir. And that evidence is already here, it's already available, and it is common proof that doesn't require individualized scrutiny. The next thing I would say is that I completely agree with the way that you put it in terms of macro and micro. The point about chutes is that you could prove a violation of RESPA by going and looking at the fit between what was paid and what you got back. But that required case-by-case analysis, transaction-by-transaction. That is not the case here where there is a unified agreement, consideration paid and a referral agreement that comes back. The third thing I would say is it's very important for this court to look at the law of the case, as was mentioned. Because under Leslie Salt, the law of the case includes everything that was decided by necessary implication, even if it is cryptic and somewhat ambiguous in the holding. That's what Leslie Salt says. That's the Ninth Circuit precedent on law of the case? Yes, sir. Yes, sir. And in 2010, this court said that there is a single overwhelming common question about whether this deal violates RESPA. And it also said that with respect to referrals, any written referral agreement satisfies the action element, and based on testimony about the title insurance industry as a whole, it said that the causation or affirmative influence question could be answered by common proof. That is the law of the case. Out of time, counsel. I know. And let me just say one more thing. Go ahead. My sentence is this. If you add up all of First American's arguments, they're summarized in pages one to three of our agenda, about individualized issues, about referrals, about the method of business organization, et cetera, we presented a prima facie case on 38 agencies. They had something to say about 29 of them. Under any possible analysis, there's nine agencies where there should be a class certified because no individualized issue has been raised by First American, with the exception of this HC2 thing, and the court's going to decide that on a global basis. There was no justification for the district court to depart from what this court had held in 2010. We ask that the law of the case be applied and that the class be certified. Thank you. Thank you all very much. The case just argued is submitted, and we'll get you a decision as soon as we can. Thank you. I appreciate it. We will be adjourned for the day.
judges: Murphy, Gould, Tallman